UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN **1 6** 2021

JAMES W. McCORMACK, CLERK
By: _____
DEP CLERK

Case No. 4:21-CV-00518-KGB

---

FEDERAL TRADE COMMISSION, and

STATE OF ARKANSAS, *ex rel.*
LESLIE RUTLEDGE,
ATTORNEY GENERAL,

    Plaintiffs,

    v.

BINT OPERATIONS LLC, a limited liability
company,

LASHONDA MOORE, individually and as an
officer of BINT OPERATIONS LLC, and

MARLON DEANDRE MOORE, formerly known
as MARLON DEANDRE MAIDEN, individually
and as an officer of BINT OPERATIONS LLC,

    Defendants.

---

**COMPLAINT FOR PERMANENT
INJUNCTION, MONETARY
RELIEF, AND OTHER RELIEF**

This case assigned to District Judge Baker
and to Magistrate Judge Kearney

---

Plaintiffs the Federal Trade Commission ("FTC") and the State of Arkansas (collectively, "Plaintiffs"), for their Complaint allege:

1.    The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Consumer Review Fairness Act of 2016 ("CRFA"), 15 U.S.C. § 45b, which authorize the FTC to seek, and the Court to order, preliminary and permanent injunctive relief, monetary relief, and other relief for

1

Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and Section 2(d) of the CRFA, 15 U.S.C. § 45b. Defendants' violations are in connection with their operation of a "blessing loom" pyramid scheme.

2.      The State of Arkansas, by and through Leslie Rutledge, the Arkansas Attorney General, brings this action to redress and restrain violations of the Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"), Ark. Code § 4-88-101 *et seq.*

## SUMMARY OF CASE

3.      Defendants BINT Operations LLC, LaShonda Moore, and Marlon Moore (collectively, "Defendants") have operated "Blessings in No Time" or "BINT," which they have claimed to be a safe, lucrative, and legal moneymaking membership program.

4.      In truth, BINT has been an illegal pyramid scheme. BINT has solicited money from consumers and promised them investment returns as high as 800 percent. These promises are false. The supposed investment returns Defendants have promised members they would receive have been, in reality, merely funds other members paid to participate in the scheme. By the program's design, most members have not earned returns but have instead lost the money they have paid to participate in BINT. Therefore, BINT has not been a safe, lucrative, or legal moneymaking program. In addition, to help perpetuate their scheme, Defendants have prohibited members from posting anything concerning BINT online or on social media. Members who have violated this rule risked forfeiting the money they have paid into the scheme. This prohibition has prevented aggrieved consumers from alerting other consumers that BINT has not been a legitimate enterprise. Defendants, through their BINT program, have caused thousands of

consumers tens of millions of dollars in losses. In particular, Defendants have harmed at least hundreds of Arkansan consumers.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

6.      This Court has supplemental jurisdiction over the claims of the State of Arkansas pursuant to 15 U.S.C. § 1367.

7.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and (d), and 15 U.S.C. § 53(b).

## PLAINTIFFS

8.      The FTC is an independent agency of the United States Government created by the FTC Act, 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the CRFA, 15 U.S.C. § 45b, which prohibits, *inter alia*, the use of form contracts that restrict consumers' ability to provide reviews about a seller's products, services, or conduct.

9.      Attorney General Leslie Rutledge is the chief legal officer of the State of Arkansas. Pursuant to Ark. Code § 4-88-104 and 4-88-113, the State of Arkansas may seek civil enforcement of the Arkansas DTPA. The State of Arkansas, through its Attorney General, also may enforce the CRFA. *See* 15 U.S.C. § 45b(e)(1).

3

## DEFENDANTS

10.     Defendant BINT Operations LLC ("BINT"), also doing business as "Blessings in No Time," is a Texas limited liability company incorporated in August 2020. Its principal place of business is located in Prosper, Texas. BINT transacts or has transacted business in this District and throughout the United States.

11.     Defendant LaShonda Moore is a co-founder, promoter, and Managing Member of BINT. She managed the day-to-day operations of BINT and appeared in numerous live videos in which she promoted the program, attempted to recruit new members, and made false representations about the earnings consumers would enjoy by investing in BINT. At all times relevant to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had the authority to control, or participated the acts and practices set forth in this Complaint. Defendant LaShonda Moore, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

12.     Defendant Marlon Moore is a co-founder, promoter, and Managing Member of BINT. He helped manage the day-to-day operations of BINT and appeared in numerous live videos in which he promoted the program, attempted to recruit new members, and made false representations about the earnings consumers would enjoy by investing in BINT. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant Marlon Moore, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

4

## COMMERCE

13.     At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## "BLESSING LOOM" PYRAMID SCHEMES

14.     For many consumers, the COVID-19 pandemic has meant twin disasters: a global health crisis paired with job loss or diminished income. Scammers have sought to capitalize on consumers' financial hardship by promoting purported investment or fundraising programs that, in reality, are dressed-up pyramid schemes.

15.     BINT is a chain-referral scheme, a type of pyramid scheme that does not typically involve the sale of products or services. "Blessing Looms," "Circle Games," and "Money Boards" are among the names used to describe chain-referral schemes like BINT. Blessing looms typically coordinate payments within the pyramid using "playing boards" that track members and their respective positions within the program. In general, these schemes falsely promise a big return—or as BINT termed it, being "blessed out"—following a modest initial payment. In reality, however, very few consumers make any money. And the few consumers that do make money sometimes lose their profits by reinvesting in the scheme. Moreover, the amounts paid to some members of the scheme are not returns on any investment. In truth, revenues come from payments other, later members make to participate in the scheme. In such chain-referral schemes, the money dries up as soon as the scheme's members can no longer find new recruits willing to make those payments, leaving newer members unable to recoup their payments.

16.     A blessing loom pyramid scheme imitates an informal savings club called a *"sou sou."* *Sou sous* have historic and cultural roots in West Africa and the Caribbean. In a *sou sou*, a small group, typically composed of friends and family, pool their money into a common fund and take turns receiving the payout. But unlike an illegal blessing loom, members in a *sou sou* are not promised they will earn interest, are not promised more than they pay in, and are not rewarded for recruiting new members.

## DEFENDANTS' BUSINESS ACTIVITIES

17.     Beginning in at least June 2020, Defendant LaShonda Moore and her husband, Defendant Marlon Moore, created and have promoted membership in a purported moneymaking program called "Blessings in No Time" or "BINT." In August 2020, they formed a company, BINT Operations LLC, through which they have operated the program.

18.     Defendants have lured people into joining BINT by promising investment returns as high as 800 percent. Defendants have not premised the money consumers could allegedly earn from their blessing loom on selling products. Moreover, Defendants have not limited how much members could contribute to BINT: while $1,400 has been the minimum required to participate in the program, members have been told that they could earn greater revenue by contributing more money and recruiting additional members. Some members have paid as much as $62,700 to participate in BINT.

6

**BINT's Blessing Loom**

19.      Consumers typically have been recruited to join BINT by friends, family members, or acquaintances. Consumers have joined the program by submitting an application at bintapp.com and listing the member that recruited them, or by texting a code to 474747 and following the instructions to apply. After joining BINT, members could participate in the BINT blessing loom. Like most blessing looms, BINT has coordinated payments between members (termed "blessings" in BINT) using playing boards. BINT's playing board has consisted of four levels, arranged concentrically. In the initial version of Defendants' scheme, beginning in June 2020, the first level of the BINT playing board, furthest from the center, contained eight new members (termed "fires"). These participants were usually the recruits of the four members on the second level (the "wind" level). Usually, the third level (the "earth" level) had two members, with one member on the fourth level (the "water" level) at the center of the board. Below is Defendants' graphic explaining the process:



20.     The members on the first level, the fires, were required to send a payment, or "blessing," typically $1,400 or more, to the member at the center of the board, the water. In August, Defendants began requiring that members pay to use a "board management software" called Conecmi to keep track of their position on the board and their payments.

8

21.     Members on the second level, the wind level, were tasked with recruiting two new members. In lieu of recruiting new members, wind-level members also had the option of paying BINT a set fee for recruits to be added to their board or paying additional money themselves to fill the fire position. Or, if the wind-level member had never received a payout from the BINT program, they could request that BINT provide them their two required recruits free of charge. After all board positions were filled and new recruits had sent their payments, the board was ready to "split."

22.     When a board was "split," the initial board was divided into two new boards. The individual in the middle of the original board was removed, and all other members moved up one level toward the center of the board. Then the process repeated: new recruits were added to each board, and these recruits sent their payments to the individual in the center. This process continued indefinitely, with each completed board splitting into two new boards and members moving up a level with each split. After three boards, a new recruit, or fire, from the first board would be "in the water" and ready to receive the "blessing" from the new "fires" or recruits.

### Defendants Have Promoted BINT as a Safe, Lucrative, and Legal Moneymaking Program

23.     Defendants have promoted BINT through a variety of methods, including through their website, BINTapp.com, by sending mass text messages, and through word-of-mouth recruiting, regularly hosting live video calls on platforms such as Zoom and band.us.

24.     Defendants have primarily targeted Black communities and have stated in the "BINT Bible," which contains BINT's membership bylaws, that "ALL BINT MEMBERS MUST BE OF AFRICAN-AMERICAN DESCENT. ABSOLUTELY NO EXCEPTIONS!" In around November 2020, Defendants eventually eased this restriction on membership. On this

9

topic, Defendant LaShonda Moore stated in a recorded live video that "BINT is still a Black community; it will forever be a Black community. But it is now—officially right now—open to all."

25. On their website, Defendants market BINT as a new type of investing or fundraising called "linkfunding." Defendants specifically target financially distressed consumers, claiming that linkfunding would permit members to "do everything from pay[ing] for your own surgery to fulfill[ing] a student's dream of attending college—and so much more." Their website claims that "[p]eople often turn to linkfunding when they can't afford the rapidly increasing cost of medical care, or when they lack insurance to cover major medical procedures" and that linkfunding provides an alternative "[w]hen funding from the government and nonprofits falls short[.]"

26. Defendants have claimed their program has provided a means to achieve financial freedom and generational wealth. For example, Defendants claim on their website that people can use the BINT program to "[b]uild wealth with your crew. Harness the power of social banking technology, machine learning, and credit building resources." Further, BINT's website prominently displays purported member testimonials touting the financial success they claimed to have achieved through the program. One claims, "[i]n 6 months, November, 30th [sic] to be exact, I became debt free." Another states, "I can honestly say if it had not been for this community, there is no way I would have been able to reach my financial goals for 2020."

27. In a recorded live presentation for BINT members, Defendant LaShonda Moore has claimed that her "personal goal" has been "to see how many of y'all I can turn into millionaires." In another recorded live presentation, Defendants LaShonda Moore and Marlon

Moore introduced a guest speaker who has asserted that BINT "is a great opportunity for each and every one of us to do something that we were told that we could not do. We could not be financially wealthy. We could not buy this house on the other side of the railroad track…. This is a process where we can get up to $11,400 every month—that's at a minimum."

28.     Defendants have promoted BINT as a community-oriented program where members have worked together to help each other achieve financial success. For example, their website claims BINT is "Helping People Meet Their Life Goals" and touts the "Thousands of Members Serviced Within the First Six Months." In a recorded live presentation, Defendant Marlon Moore has stated that Defendants had started their program to help "people achieve some kind of success in their lives," to enable people to "come together in a time of need," and to "help people help other people….become better in their finances…."

29.     Defendants have claimed BINT has been a safe, lucrative investment and that members would not lose money. In many instances, Defendants have promised BINT members that if the member paid $1,400 to join a BINT playing board, they would be paid out $11,200, and if they paid $1,425 to join the board, they would be paid $11,400. As detailed below, Defendants have assured members that they could withdraw at any time and receive a full refund of any money paid into the program.

30.     Defendants initially claimed that so many people wanted to join BINT that members would not need to recruit anyone to receive their first $11,200 payout—they simply needed to pay at least $1,400. Once that promise started to fall apart, Defendants began pushing members to either recruit participants or invest additional money in lieu of recruiting.

31.     Defendants have repeatedly assured participants who expressed concern about the security of the money they had paid into BINT that they would eventually receive a substantial payout. For example, in recorded live presentations to BINT members, Defendant Marlon Moore stated, "we're going to make sure that y'all get blessed. Just trust us." In another live video presentation, he further assured members, "no one will lose." Likewise, Defendant LaShonda Moore on multiple occasions has stated that members would not lose money in BINT. For example, in a recorded live video presentation, Defendant LaShonda Moore stated:

> "You guys will never—and I hope somebody's recording me, I'm recording myself saying this right now—y'all will never come in here and say 'I lost more than I put in.' At a minimum, we will make sure that whatever you have put into this group, you will get back. And we built our own insurance inside of this community to make sure that this happens."

Moreover, a guest speaker introduced by Defendants LaShonda Moore and Marlon Moore told the BINT community in a recorded live video, "the last time I checked, and you can correct me if I'm wrong, there is not a person out there that can say 'I lost money with BINT.'"

32.     Defendants have also repeatedly represented to members that BINT has been a legal and legitimate method of investing money and generating wealth. For example, in a recorded live presentation, a guest speaker claimed that the sum of money consumers had invested in BINT at that time proved that BINT was a legitimate enterprise:

> "If $29 million [*i.e.*, the amount members had invested in BINT to that point] don't tell you, or does not make you think that this is legit, sweetheart, you in the wrong place. You are absolutely in the wrong place if $29 million does not confirm to you that we are serious about the things that are going on over here. So please understand that the legitimacy of what BINT is doing, of what LaShonda and Dre [*i.e.*, Marlon Deandre Moore] has put together, it is absolutely unquestionable."

Defendants LaShonda and Marlon Moore have also made frequent reference to consulting with "their attorneys" concerning the changes they have implemented at BINT, implying that the program was legal.

33.     As proof that BINT has been a legal operation, Defendants have touted that government employees have allegedly been part of the BINT community. In one recorded live video, LaShonda Moore and Marlon Moore alleged that the BINT community has included individuals who are "high up" at the IRS, as well as employees at the Pentagon and FBI. Noting these prominent BINT members, LaShonda Moore concluded: "So anytime you all think we're doing something wrong, know that we aren't."

34.     Defendant LaShonda Moore informed viewers of a recorded live call that BINT operated according to the "Attorney General standards." Further, in a recorded live video, BINT's manager stated:

> "BINT moves this way for a reason. BINT has been to the attorney general's office and has come out scotch-free [sic] for a reason. We have attorneys for a reason. We say 'yes' and 'no' to certain things for a reason. That's because we are working legally. And so I know a lot of times you guys send us ideas and you're like 'why can't you do this?' and you think that we don't listen. And that's not the case; we listen. However, we've already been legally advised that that's not in the best interest to the business of BINT."

35.     Additionally, in a recorded live video, Defendants LaShonda and Marlon Moore discussed a recent law enforcement action brought by the Arkansas Attorney General against a blessing loom scheme similar to BINT. While assuring BINT members they had nothing to be concerned about, Defendant LaShonda Moore stated that "the things that they are actually being sued for, those things have never and will never happen over here with us."

36.     Defendants have also repeatedly assured members they would receive a full refund if the member has decided to leave BINT for any reason. For example, BINT's "Frequently Asked Questions" document for "BINT Community Members" states that members may "request a refund" by simply "go[ing] to Bintapp.com and select[ing] request a refund." Moreover, in recorded video calls with BINT members, Defendant LaShonda Moore stated:

-       "I just need to know that everybody that's in this group trusts us…. Let's say 25 percent of this group decides to leave right now—that's 2,000 people. I'm going to stand ten toes down and say we're going to give all those people their refund; we're going to do right by those people, and the ball is going to keep rolling. Whatever we have to do to keep this train going is what we're going to do. And guys, I meant that."

-       "We are working refunds in the order received. You will get a refund…. There's no other community that gives you refunds."

-       "It's a long refund list, and we'll make sure you get it…."

37.     Additionally, in recorded video calls with BINT members, Defendant Marlon Moore stated:

-       "Guys, if you put your name on the refund list, and you qualify for a refund, you will get your refund, y'all. So just let us work it; just kind of be patient with us. But we're still working these refunds each and every day…. We'll get to you, don't worry about it…. So just understand it's a process. And, you know, we're still working it to the best of our ability."

-       "You guys will receive your refund—we're not going back on that, guys. We're still going to give you your refund."

38.     Defendants, however, have failed to provide requested refunds. Moreover, LaShonda Moore recently admitted in a live video call that BINT no longer has the funds to

provide the promised refunds and that the proposed defendants "do not have it financially to refund everybody in this community even if we wanted to."

### *In Reality, BINT is a Pyramid Scheme.*

39.     Contrary to Defendants' promises, the structure of Defendants' program, which created a continual chain of recruitment and recruitment-related payments, is a pyramid scheme. BINT's structure has ensured that few members would achieve the results Defendants have promised. In fact, most members necessarily have failed to recoup their contributions, let alone realize any profit.

40.     BINT's structure has required that it grow perpetually and exponentially. For every member who received the promised payout, eight additional members had to pay into the scheme. Thus, no matter how many members receive the promised payout, many more members would necessarily lose money, simply based on the scheme's structure. This is true regardless of how big the scheme grew through exponential recruiting. Below is an FTC-created image illustrating the board splitting process:



The Operation of BINT's Blessing Looms

41.    To keep the scheme growing, Defendants have pushed members to bring in new potential recruits—termed "Sparks." For example, in one of Defendants' videos, the speaker enticed BINT members with possible rewards for bringing in the most recruits: "Members that

sign up the most Sparks will have a chance to win cash giveaways, big screen TVs, iPads, and gift cards." In a mass text message sent to BINT members, Defendants stated that "[m]embers with the most new signups can win Cash Giveaways, Flat Screen Tv's and so much more!! Please invite ALL your friends and family to join." In another instance, Defendant Marlon Moore, in a recorded live video, encouraged members to "tell all your people, tell all your friends and family" to join a BINT recruitment Zoom call. To entice members to do so, Marlon Moore informed members BINT would be giving away two 50-inch flat screen TVs, Amazon gift cards, and other prizes to members that invite the most consumers to the BINT recruitment presentation. In this same recorded live video, Defendant Marlon Moore instructed members: "I need everybody go out there and talk to anywhere from three to five people, right? Go ahead and talk; go ahead and have those conversations. Get them pumped up. Get them excited. Don't worry; when you get them there, we're going to do the rest."

42.     While Defendants had initially promised members that their first payout would not require recruiting, members had always been required to recruit to obtain subsequent payouts. Moreover, Defendants LaShonda Moore and Marlon Moore have encouraged BINT members to confront other members who hurt recruiting by speaking negatively about their experience on the BINT message board. In one recorded live video, Defendant Marlon Moore told viewers that members who made negative statements about BINT were taking "the blessings out of your pockets." Moreover, on many occasions, BINT has removed members who disparaged or criticized BINT from BINT's private Band app messaging board.

*Changes to BINT's Program and the BINT "Restart"*

43.     Defendants have made several superficial changes to their program over its lifespan. However, while Defendants' scheme has evolved over time, it has remained a pyramid in every iteration.

44.     Many of Defendants' changes have been intended to address stagnation in recruiting or paying out BINT members. One such change, termed "fusion," was implemented in September 2020. As part of this process, Defendants have halved the size of some playing boards to lessen the number of recruits required to be entitled to a payout—and have cut the promised payout in half. Moreover, around this same time, Defendants began combining boards that had vacant spots, which had been created either by members dropping out of the BINT program or by other members' inability to recruit. In each instance, rewards paid out have been based on recruiting, and the basic pyramid structure of the scheme has remained.

45.     In September 2020, Defendants also began allowing members to participate in "subgroups" within BINT. Subgroups functioned as separate pyramids within the BINT community. Defendant LaShonda Moore described subgroups as "an extension of BINT." Subgroup leaders have managed the playing boards of their smaller, separate group of BINT members under the guidance and direction of Defendants.

46.     In November 2020, BINT announced an upcoming "restart" or "reset" of BINT. As part of this restart, BINT would visually restyle their playing boards, update the terminology used to describe the process, and change the individuals on the playing board who received payments from new recruits. The outer ring of new recruits would become the "blessings." The second level would become "invitations"; the third level, "nesters." The individual in the center

of the board would become the "testimony." Because members had become hesitant to contribute more money into the BINT program, Defendants would change the structure of payments to get members money faster. Now, new recruits would split their payment between the individual in the center of the board and the individual on the second level who recruited them to the playing board or to whom they had been assigned. This process is described in a graphic from BINT's membership handbook below:



47.     Around December 2020, Defendant LaShonda Moore described additional changes to the BINT program, which she had claimed were intended to allow BINT members to "break even." Specifically, Defendants planned to reduce members' spots on playing boards such

that members would no longer profit but merely get their money back—that is, if they were able to make it to the center of the board and receive a payout.

*Defendants Will Likely Continue to Violate the Law*

48.     After luring in thousands of consumers into their scheme and causing them to pay tens of millions of dollars, Defendants continued to promote and operate BINT—even while being aware that former members had complained to the FTC, state attorneys general, and the Securities and Exchange Commission, among other authorities, concerning their illegal operation.

49.     In a February 2021 live video presentation, Defendant Marlon Moore detailed plans for the upcoming "restart" of BINT and changes to the BINT program that Defendants had planned to implement in or around April 2021. On this video call, Defendant Marlon Moore assured members that "[y]ou can still recruit. You can still bring people in."

50.     Defendants have attempted to hide their illegal activity from law enforcement and payment processors. For example, they have forbidden BINT members from using certain payment apps to send their payments due to those processors having previously flagged BINT transactions. They have also advised members to change the payment amounts to avoid detection by payment apps.

51.     Further, Defendants forbid members from posting publicly on social media about BINT. Specifically, Article I of BINT's "BINT BIBLE," which contains BINT's "MEMBERSHIP BYLAWS," states:

> **"ADHERE TO THE BINT PRIVACY AGREEMENT**
> ABSOLUTELY NO POSTING ANYTHING BINT RELATED ON
> SOCIAL MEDIA REGARDLESS TO [sic] IF YOU SAY 'BINT' OR NOT."

21

Moreover, Article II of the "BINT BIBLE" includes a "Code of Conduct" that includes "SOCIAL MEDIA POSTING" in a list of "AUTOMATIC TERMINATION ACTIONS" that "WILL RESULT INTO IMMEDIATE TERMINATION" from BINT "WITH ZERO TOLERANCE." BINT's Code of Conduct further states that members who violate BINT's membership requirements risk "PERMANENT TERMINATION (REFUND COULD BE FORFEITED)" and "FORFEITURE OF INITIAL INVESTMENT OR BLESSINGS SENT OR BLESSINGS TO BE RECEIVED." Additionally, Defendants' "BINT 101: Community Resource Guide" advises members that "post[ing] on Social Media . . . will result in immediate removal from the BINT community."

52.     In many instances, Defendants have required that consumers agree to BINT's prohibition against posting on social media and the Internet as a prerequisite to joining the program. Consumers have been able to receive information about how to join BINT by texting the word "FIRE" to the number 474747. In response, consumers have received a text message instructing them to "Please click on the link below to enter required information for enrollment." This text message further includes a hyperlink to BINT's enrollment page at https://airtable.com/shrEuilOptDin7JX0. In addition to requesting identifying information about the consumer, the hyperlinked enrollment page includes BINT's "Privacy Agreement," which states:

PLEASE READ CAREFULLY

Guidelines are set in place to protect your personal safety and the financial blessing community. If they are not adhered to, there is a strict consequence.

If you text content and details from the presentation and the group chat, you risk the information being posted on the internet or social media.

22

> If you post on social media or on the internet, you will be removed
> from the board and removed from the group chat.

Immediately beneath this privacy agreement, the enrollment page states: "Reply 'Agree' below to the privacy agreement," followed by an empty text entry box for consumers to type their response.

53.     Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission: Defendants have engaged in their unlawful acts and practices willfully and knowingly and had continued to do so despite being aware that consumers have complained to state attorneys general, the FTC, and the SEC, among other law enforcement agencies. Defendant LaShonda Moore had previously participated in a different unlawful blessing loom scheme before launching BINT. Moreover, Defendants have continued to engage in their illegal scheme even after learning that the Arkansas Attorney General brought a civil action to halt a substantially similar pyramid scheme. *See Arkansas v. Passionate Minds Foundation, Inc.*, Case No. 23CV-20-1164 (Faulkner Cnty. Ark. Cir. Ct. Nov. 2, 2020). Defendants have taken steps to hide their activities from payment processors and law enforcement agencies. Further, Defendants have stated explicitly their intention to continue operating their scam and maintain the means, ability, and incentive to do so.

## VIOLATIONS OF THE FTC ACT

54.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

55.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

56.     A pyramid scheme constitutes a deceptive act or practice prohibited by Section 5(a) of the FTC Act.

### Count I (by FTC)
### Illegal Pyramid Scheme

57.     Defendants have promoted participation in programs that were characterized by the payment of consideration by a new recruit to other participants in the program, in return for which the recruit obtained the right to receive compensation for recruiting others into the program, thereby resulting in a substantial percentage of participants losing money.

58.     Defendants' promotion of this type of scheme, also referred to as a chain referral scheme, a type of pyramid scheme, constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count II (by FTC)
### Misrepresentations

59.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of the right to participate in BINT, Defendants have represented, directly or indirectly, expressly or by implication, that people who participated in BINT would:

  a)     earn substantial income;

  b)     not lose money;

  c)     receive a full refund upon request; and

  d)     be participating in a lawful moneymaking program.

60.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 59, people who participated in BINT:

a)     did not earn substantial income;

b)     have lost money;

c)     did not receive a full refund upon request; and

d)     were not participating in a lawful moneymaking program.

61.     Therefore, Defendants' representations as set forth in Paragraph 59 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count III (by FTC)
### Unfair Restrictions on Publishing Truthful Commentary

62.     In numerous instances, Defendants have used tactics, including financial threats, intimidation, membership bylaw and code of conduct provisions, and privacy agreements prohibiting members from publishing material related to BINT online or on social media, which have prevented consumers from speaking or publishing truthful, non-defamatory negative comments or reviews about BINT and its operations.

63.     Defendants' practices as described in paragraph 62 have caused or are likely to cause substantial injury to consumers that is not reasonably avoidable by consumers and that is not outweighed by countervailing benefits to consumers or competition.

64.     Therefore, Defendants' practices as described in paragraph 62 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a) and (n).

## VIOLATIONS OF THE CONSUMER REVIEW FAIRNESS ACT OF 2016

65.     "CRFA" defines "covered communication" as "a written, oral, or pictorial review, performance assessment of, or other similar analysis of, including by electronic means, the goods, services, or conduct of a person by an individual who is party to a form contract with respect to which such person is also a party." 15 U.S.C. § 45b(a)(2).

66.     The CRFA defines "form contract" to mean "a contract with standardized terms (i) used by a person in the course of selling or leasing the person's goods or services; and (ii) imposed on an individual without a meaningful opportunity for such individual to negotiate the standardized terms." 15 U.S.C. § 45b(a)(3).

67.     The CRFA renders void any provision of a form contract if such provision prohibits or restricts the ability of an individual who is a party to the form contract to engage in a covered communication. 15 U.S.C. § 45b(b)(l).

68.     The CRFA prohibits any person from offering a form contract containing a provision described as void in sub-section (b) of the CRFA. 15 U.S.C. § 45b(c).

69.     Pursuant to the CRFA, a violation of sub-section (c) of the CRFA shall be treated as a violation of a rule defining an unfair or deceptive act or practice prescribed under Section 18(a)(1)(B) of the FTC Act, 15 U.S.C. § 57a(a)(l)(b), and the FTC shall enforce the CRFA in the same manner, by the same means, and with the same jurisdiction, powers, and duties as the FTC Act. 15 U.S.C. § 45b(d).

70.     Defendants have offered "form contract[s]," as that term is defined in the CRFA. 15 U.S.C. § 45b(a)(3).

## Count IV (by FTC and Arkansas)
## Violations of the CRFA

71.     In numerous instances, including as described in paragraphs 51 and 52,

Defendants have offered form contracts containing provisions that (a) prohibit or restrict the

ability of an individual who is a party to the form contract to engage in a covered communication

and (b) impose a penalty or fee against an individual who is a party to the form contract for

engaging in a covered communication.

72.     Defendants have thereby violated the CRFA, 15 U.S.C. § 45b(c).

## VIOLATIONS OF THE ARKANSAS DTPA

73.     At all times relevant herein, Defendants are "persons" who engaged in the

practices alleged herein which constitute the sale of "goods" or "services" as defined by Ark.

Code Ann. § 4-88-102. Additionally, Defendants' practices constitute business, commerce, or

trade under Ark. Code Ann. § 4-88-107.

74.     Arkansas law prohibits a person from knowingly making a false representation as

to the characteristics, ingredients, uses, benefits, alterations, source, approval, or certification of

goods or services. Ark. Code Ann. § 4-88-107(a)(1).

75.     Arkansas law prohibits the use of "concealment, suppression, or omission of any

material fact with the intent that others rely upon the concealment, suppression, or omission"

while selling any goods or services. Ark. Code Ann. § 4-88-108(2).

76.     It is a violation of Arkansas law to engage in unconscionable, false, or deceptive

acts or practices in business, commerce, or trade. Ark. Code Ann. § 4-88-107(a)(10).

77.     Under Arkansas law a "pyramid promotional scheme" means any plan or

operation through which a person gives consideration for the opportunity to receive

compensation primarily from the introduction of other persons into the plan or operation rather than from the sale and consumption of goods, services, or intangible property by a participant or other persons introduced into the plan or operation. Ark. Code Ann. § 4-88-109(b)(9)(A).

## COUNT V (by the State of Arkansas)
## Misrepresentations

78.    Defendants knowingly made false representations to consumers as to the benefits, approval, or certification of their services. In violation of Ark. Code Ann. § 4-88-107(a)(1), Defendants misrepresented that consumers would:

      a)     earn substantial income;

      b)     not lose money;

      c)     receive a full refund upon request; and

      d)     be participating in a lawful moneymaking program.

## COUNT VI (by the State of Arkansas)
## Concealment, Suppression, or Omission of Material Facts

79.    Defendants concealed, suppressed, and omitted material facts with the intent that consumers rely upon the concealment, suppression, or omission by:

      a)     Implying their activity is sanctioned by the State of Arkansas;

      b)     Inviting consumers to participate in an arrangement in which Defendants have reason to know will not result in a payout for all participants as advertised;

      c)     Representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, by falsely representing to consumers that participation in an organization will confer upon them a right to receive monetary payouts;

d)      Representing that an agreement confers or involves rights, remedies, or obligations which are prohibited by law by inviting consumers to participate in a pyramid scheme, investment opportunity, or charity program that is prohibited by law;

e)      Failing to inform consumers of the accurate chances of a payout or award in any pyramidal scheme, investment opportunity, or charity game; and

f)      Misstating legal definitions and concepts to consumers.

### COUNT VII (by the State of Arkansas)
### Unconscionable, False, or Deceptive Acts or Practices

80.      Defendants have engaged in unconscionable, false, or deceptive acts or practices in business, commerce, and trade by:

a)      Deceiving consumers into investing their money into a plan that functioned solely as an engine of fraud and caused significant economic damage to the affected consumers; and

b)      Converting consumers' funds and utilizing those funds to enrich Defendants at the expense of consumers.

### COUNT VIII (by the State of Arkansas)
### Illegal Pyramid Scheme

81.      It is unlawful to promote any pyramid promotional scheme. Ark. Code Ann. § 4-88-109(a). Defendants have engaged in prohibited conduct by:

a)      Soliciting funds from consumers for the opportunity to receive funds;

b)      Encouraging plan participants to invite other consumers to participate in the plan;

29

c)      Operating a plan through which consumers paid money for the opportunity to receive compensation rather than from the sale and consumption of goods, services, or intangible property.

## CONSUMER INJURY

82.     Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the CRFA, and the Arkansas DTPA. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs FTC and the State of Arkansas request that the Court:

A.      Enter a permanent injunction to prevent future violations of the FTC Act, the CRFA, and the Arkansas DTPA by Defendants;

B.      Grant preliminary injunctive and ancillary relief;

C.      Award Plaintiffs monetary and other relief within the Court's power to grant;

D.      Award the State of Arkansas civil penalties as the Court finds necessary to address Defendants' violations the Arkansas DTPA; and

E.      Award Plaintiffs any additional relief as the Court determines to be just and proper.

Respectfully submitted,

JAMES REILLY DOLAN
Acting General Counsel

Dated: 6/14/21

REID TEPFER
Texas Bar No. 24079444

30

LUIS GALLEGOS
Oklahoma Bar No. 19098
Federal Trade Commission
1999 Bryan St., Ste. 2150
Dallas, TX 75201
(214) 979-9395 (Tepfer)
(214) 979-9383 (Gallegos)
rtepfer@ftc.gov; lgallegos@ftc.gov

Attorney for Plaintiff
FEDERAL TRADE COMMISSION

LESLIE RUTLEDGE
Arkansas Attorney General

SHANNON HALIJAN
Arkansas Bar No. 2005136
DAVID A.F. MCCOY
Arkansas Bar No. 2006100
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 683-1509 (Halijan)
(501) 682-7506 (McCoy)
Shannon.Halijan@ArkansasAG.gov
David.McCoy@ArkansasAG.gov

Attorneys for Plaintiff
STATE OF ARKANSAS, *ex. rel.*
LESLIE RUTLEDGE, ATTORNEY GENERAL