UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| FEDERAL TRADE COMMISSION, and<br><br>STATE OF ARKANSAS, *ex rel.*<br>LESLIE RUTLEDGE,<br>ATTORNEY GENERAL,<br><br>    Plaintiffs,<br><br>    v.<br><br>BINT OPERATIONS LLC, a limited liability<br>company,<br><br>LASHONDA MOORE, individually and as an<br>officer of BINT OPERATIONS LLC, and<br><br>MARLON DEANDRE MOORE, formerly known<br>as MARLON DEANDRE MAIDEN, individually<br>and as an officer of BINT OPERATIONS LLC,<br><br>    Defendants. | Case No. 4:21-cv-00518-KGB<br><br>**STIPULATION CONCERNING<br>DEPOSITION OF DEFENDANT<br>MARLON MOORE** |

On November 21, 2022, Plaintiff Federal Trade Commission noticed the deposition of Defendant

Marlon Moore ("Defendant") for December 7, 2022, to be taken at the FTC Southwest Region

Office at 1999 Bryan St., Ste. 2150, Dallas, TX 75201. Plaintiff FTC, Plaintiff State of Arkansas,

and Defendant, personally and through his counsel, stipulate and agree as follows pursuant to

Federal Rule of Civil Procedure 29:

    1.   Defendant intends to invoke his Fifth Amendment privilege against self-incrimination at

the deposition and to refuse to answer any questions posed to his at the deposition by either

Plaintiff FTC's counsel, Plaintiffs State of Arkansas's counsel, or counsel for Defendant.

PLAINTIFFS' EXHIBIT 41
FTC-BINT-002240

2. Defendant likewise intends to invoke his Fifth Amendment privilege against self-incrimination at any trial in this matter and refuse to answer any questions.

3. **Attachment A** is a list of questions Plaintiffs intend to ask Defendant at his deposition.

4. Defendant has read each question contained in **Attachment A** and has conferred with his counsel. Further, Defendant has reviewed each document referenced in the questions contained in **Attachment A**.

5. As to each question contained in **Attachment A**, Defendant refuses to answer and invokes his Fifth Amendment privilege against self-incrimination.

6. Defendant's stipulated invocation of the Fifth Amendment privilege against self-incrimination in response to each question contained in **Attachment A** may be used for all purposes under Federal Rule of Civil Procedure 32, including at trial, in the same manner as if Defendant had responded orally on the record to each question contained in **Attachment A** by invoking Defendants' Fifth Amendment privileged against self-incrimination.

7. Defendant hereby waives all objections to the formalities of taking this deposition, such as notice, taking, transcribing, signing, certification and filing.

8. Plaintiffs reserve the right to challenge Defendant's invocation of the Fifth Amendment Privilege against self-incrimination.

9. All parties to this stipulation agree to making an appearance on the record and entering this stipulation into the record at the time of Defendant's noticed deposition.

**SO STIPULATED:**

PLAINTIFFS' EXHIBIT 41
FTC-BINT-002241

Dated:   December 6, 2022

_____

Marlon Moore
Defendant

Dated:  December 6, 2022

*/s/ Justin N. Bryan*
JUSTIN N. BRYAN
Texas Bar No. 24072006
McCathern, PLLC
3710 Rawlins Street, Suite 1600
Dallas, Texas 75219
(214) 741-2662
jbryan@mccathernlaw.com
Counsel for Defendants BINT Operations LLC,
LaShonda Moore, and Marlon Moore

Dated:  December 6, 2022

*/s/ Reid Tepfer*
REID TEPFER
Texas Bar No. 24079444
Federal Trade Commission
1999 Bryan St., Ste. 2150
Dallas, TX 75201
(214) 979-9395 (Tepfer)
rtepfer@ftc.gov

Attorney for Plaintiff
FEDERAL TRADE COMMISSION

Dated:

/s/ Amanda Land
AMANDA LAND
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2029
Amanda.Land@arkansasag.gov

3

PLAINTIFFS' EXHIBIT 41
FTC-BINT-002242

Attorney for Plaintiff
OFFICE OF THE ARKANSAS ATTORNEY GENERAL

4

PLAINTIFFS' EXHIBIT 41
FTC-BINT-002243

## ATTACHMENT A

1. Isn't it true that you are familiar with a program called "Blessings in No Time"?

2. Isn't it true that the Blessings in No Time program was also referred to as BINT?

3. Isn't it true you were a founder of BINT?

4. Isn't it true your spouse, Defendant LaShonda Moore, was a co-founder of BINT?

5. Isn't it true you operated BINT?

6. Isn't it true you did not answer to anyone at BINT?

7. Isn't it true you managed the day-to-day operations of BINT?

8. Isn't it true you managed the day-to-day operations of BINT together with your spouse, Defendant LaShonda Moore?

9. Isn't it true you had authority to control BINT?

10. Isn't it true your spouse, Defendant LaShonda Moore, had authority to control BINT?

11. Isn't it true BINT had members across the country?

12. Isn't it true BINT Operations LLC is the company that operated BINT?

13. Isn't it true you used BINT Operations LLC to operate the BINT program?

14. Isn't it true you have had authority to control BINT Operations LLC?

15. Isn't it true BINT was intended to look similar to a sou sou?

16. Isn't it true you have described BINT as being like a sou sou?

17. Isn't it true that the Certificate of Formation for BINT Operations LLC was filed in August 2020?

18. Isn't it true that BINT was operating before BINT Operations LLC's Certificate of Formation was filed?

4

PLAINTIFFS' EXHIBIT 41

FTC-BINT-002244

19. Isn't it true BINT was operating by June 2020?

20. Isn't it true you had authority to hire employees and contractors on behalf of BINT?

21. Isn't it true you had authority to fire employees and contractors on behalf of BINT?

22. Isn't it true you in fact hired employees or contractors on behalf of BINT?

23. Isn't it true you in fact fired employees or contractors on behalf of BINT?

24. Isn't it true you had authority to control all of BINT's marketing and advertising?

25. Isn't it true your spouse, Defendant LaShonda Moore, had authority to control all of BINT's marketing and advertising?

26. Isn't it true you had authority to control all of BINT Operations LLC's marketing and advertising?

27. Isn't it true your spouse, Defendant LaShonda Moore, had authority to control all of BINT Operations LLC's marketing and advertising?

28. Isn't it true you had authority to control all of BINT's policies?

29. Isn't it true your authority to control BINT's policies included BINT's refund policy?

30. Isn't it true BINT did not limit the amount that individuals could invest in the BINT program?

31. Isn't it true that, for most of BINT's existence, it has been a Black-only community?

32. Isn't it true you instituted a policy where BINT members had to be Black?

33. Isn't it true that BINT changed the policy requiring that members be Black in November 2020?

34. Isn't it true that you changed the policy requiring that members be Black because BINT

5

PLAINTIFFS' EXHIBIT 41

FTC-BINT-002245

was struggling to recruit new members?

35. Isn't it true you promoted BINT to consumers?

36. Isn't it true you have promoted BINT in numerous live videos?

37. Isn't it true that the BINT promotional videos you appeared in were typically broadcast on Zoom?

38. Isn't it true thousands of individuals typically joined these promotional calls you appeared in?

39. Isn't it true you have reviewed the FTC and Arkansas's Complaint in this case (Doc. 1) against you?

40. Isn't it true the quotes attributed to you in Plaintiffs' Complaint in this case (Doc. 1) are accurate?

41. Isn't it true the quotes attributed to you in Plaintiffs' Complaint in this case (Doc. 1) are statements made by you to consumers?

42. Isn't it true you have represented to consumers that BINT is a low-risk investment?

43. Isn't it true you have represented in many instances that BINT is a safe investment?

44. Isn't it true you have represented in many instances to consumers and BINT members that BINT is safer than traditional investments?

45. Isn't it true you have represented in many instances to consumers and BINT members that members could earn investment returns as high as 800 percent?

46. Isn't it true you represented in many instances to consumers that, by paying $1,400 to join a BINT playing board, they would earn $11,200?

47. Isn't it true you have represented to consumers in many instances that, by paying $1,425

6

to join a BINT playing board, they would earn $11,400?

48. Isn't it true BINT's website was bintapp.com?

49. Isn't it true you are familiar with the content of the bintapp.com website from 2020 and 2021?

50. Isn't it true you paid the web hosting fees associated with bintapp.com.

51. Isn't it true you hired the individuals who created content for bintapp.com?

52. Isn't it true bintapp.com prominently displayed testimonials from members for much of 2020 and 2021?

53. Isn't it true that you approved all drafts of the BINT Membership Handbook, including but not limited to the Membership Handbook (Last Updated December 2020) (Bates-labeled FTC-BINT-000097—000106) and the Membership Handbook (Last Updated January 8, 2021) (Bates-labeled FTC-BINT-000107—000116, before their distribution to BINT members?

54. Isn't it true you advised the author of the BINT Membership Handbook, including but not limited to the Membership Handbook (Last Updated December 2020) (Bates-labeled FTC-BINT-000097—000106) and the Membership Handbook (Last Updated January 8, 2021) (Bates-labeled FTC-BINT-000107-000116), as to what content to include in the document?

55. Isn't it true that you have represented to numerous consumers in many instances that BINT has been a legal enterprise?

56. Isn't it true that a version of your "Frequently Asked Questions" document, previously marked **Exh. 7, Bates No. Moore 117**, represented that BINT was legally compliant?

7

57. Isn't it true you have represented BINT to be a profitable investment program to consumers in many instances?

58. Isn't it true "Testimony" position is a synonym for a water-position member on a Playing Board?

59. Isn't it true BINT members were prohibited from posting anything concerning BINT publicly online?

60. Isn't it true BINT members were prohibited from posting anything concerning BINT on social media?

61. Isn't it true that you advised members that they were prohibited from posting anything concerning BINT publicly online?

62. Isn't it true members were told that if they posted anything concerning BINT publicly on social media they risked forfeiting their investment in the BINT program?

63. Isn't it true members were told that if they posted anything concerning BINT publicly online they risked forfeiting their investment in the BINT program?

64. Isn't it true under the rules for participating in BINT, members risked forfeiting their initial investment, also referred to as a "Blessing," if they posted on social media about BINT?

65. Isn't it true BINT members were provided the document **MOORE 000017**, which stated "ABSOLUTELY NO POSTING ANYTHING BINT RELATED ON SOCIAL MEDIA"?

66. Isn't it true You advised members concerning how to avoid having their Blessing payment flagged by payment apps?

8

67. Isn't it true that for the first three months BINT existed, BINT did not offer members a credit guide?

68. Isn't it true BINT did not offer insurance classes to members until after October 23, 2020?

69. Isn't it true that for the first three months BINT existed, BINT did not offer members insurance classes?

70. Isn't it true some members resided in Little Rock, Arkansas at the time of their participation in BINT?

71. Isn't it true some members resided in Conway, Arkansas at the time of their participation in BINT?

72. Isn't it true some members resided in North Little Rock, Arkansas at the time of their participation in BINT?

73. Isn't it true some members resided in other cities in Arkansas, including, but not limited to, Dumas, Camden, West Memphis, Alexander, Blytheville, Austin, Marion, Jonesboro, Gurdon, Pine Bluff, and Bryant?

74. Isn't it true that, except on Fusion playing boards, for every member who received a payout (i.e., was "blessed out"), eight additional members had to pay into BINT?

75. Isn't it true that on Fusion playing boards, for every member who received a payout (i.e., was "blessed out"), four additional members had to pay into BINT?

76. Isn't it true that for every Member who received either the $11,200, $11,400, $5,600, or $5,700 for their participation in BINT, multiple members had to pay into BINT?

77. Isn't it true you represented that participating in BINT would allow members to achieve

9

financial freedom?

78. Isn't it true you represented that participating in BINT would allow members to achieve generational wealth?

79. Isn't it true that you represented to consumers that they would not lose the money they invested in BINT?

80. Isn't it true that LaShonda More stated in a 2020 Zoom call for BINT members that "my goal is to get every person back at least what they put in back by Thanksgiving"?

81. Isn't it true that in numerous instances you assured participants who expressed concern about the security of the money they had paid into BINT that they would eventually be blessed out?

82. Isn't it true that in numerous instances you assured participants who expressed concern about the security of the money they had paid into BINT that they would be entitled to a refund if they ever wanted one?

83. Isn't it true you authorized Victor Green to speak on behalf of BINT on a BINT live Zoom video?

84. Isn't it true that, on a Zoom call for BINT members, LaShonda Moore stated that "We also have not one but two state senators inside this community"?

85. Isn't it true that, on a Zoom call for BINT members, Marlon Moore stated concerning the BINT community that "we've got FBI in the building"?

86. Isn't it true that, on a Zoom call for BINT members, after discussing individuals employed by various government agencies, LaShonda Moore stated: "so any time you all think we're doing something wrong, know that we aren't"?

10

PLAINTIFFS' EXHIBIT 41
FTC-BINT-002250

87. Isn't it true that no earlier than November 2020 you became familiar with the case relating to Passionate Minds brought by the Arkansas Attorney General's Office?

88. Isn't it true that BINT first offered products, such as e-courses, e-books, and an insurance adjuster course, after you learned about the Passionate Minds case brought by the Arkansas Attorney General's Office?

89. Isn't it true that in numerous instances you represented to members and recruits that they would be entitled to a refund of the money they invested in BINT if they ever wanted it?

90. Isn't it true that in numerous instances you represented that there were no limitations on members' right to a refund?

91. Isn't it true that in numerous instances you represented to consumers that members could ask for a refund at any time?

92. Isn't it true that Marlon represented on a Zoom call for BINT members that members can "always" get a refund if they want one?

93. Isn't it true that BINT stopped attempting to give refunds to members who requested refunds?

94. Isn't it true that you used the money left in the account that BINT had dedicated to providing refunds to pay off your mortgage?

95. Isn't it true that in many instances you responded to member complaints directly?

96. Isn't it true that you directed individuals you had hired to respond to complaints concerning BINT?

97. Isn't it true that numerous members complained about not being blessed out?

98. Isn't it true that numerous members complained about not receiving a refund when

11

PLAINTIFFS' EXHIBIT 41

FTC-BINT-002251

requested?

99. Isn't it true that you were aware that numerous members complained to BINT?

100.     Isn't it true that you had Admins advise you concerning member complaints?

101.     Isn't it true that BINT used the services of a company called Conecmi, LLC?

102.     Isn't it true that Conecmi, LLC had a website located at Conecmi.com?

103.     Isn't it true that Conecmi, LLC provided BINT the use of its board management

software to run its program?

104.     Isn't it true you had an ownership interest in Conecmi, LLC?

105.     Isn't it true you discussed the possibility of having an ownership interest in

Conecmi, LLC with Nehemiah Thompson?

106.     Isn't it true you had a partnership agreement with Conecmi, LLC?

107.     Isn't it true that you promoted Conecmi, LLC's software platform to individuals

associated with other blessing clubs or sou sous?

108.     Isn't it true BINT coordinated payments between members using BINT's playing

boards?

109.     Isn't it true BINT's playing boards were used to allow members to track their

position to determine when they would receive a payout?

110.     Isn't it true that in one version of BINT's playing board, these four levels were

called fire, wind, earth, and water?

111.     Isn't it true that the version of the BINT playing board BINT has used for most of

the program's existence has been the playing board that had four levels consisting of fire,

wind, earth, and water?

PLAINTIFFS' EXHIBIT 41
FTC-BINT-002252

112.     Isn't it true that the fire-level participants on the playing board were typically the new recruits?

113.     Isn't it true the water was the position at the center of the board?

114.     Isn't it true members on the wind level of the BINT playing board were tasked with recruiting members to their playing board?

115.     Isn't it true that the typical BINT playing board had eight fire-level members?

116.     Isn't it true that the typical BINT playing board had four wind-level members?

117.     Isn't it true that the typical BINT playing board had two earth-level members?

118.     Isn't it true that the typical BINT playing board had one individual "in the water"?

119.     Isn't it true that, as the BINT playing boards originally worked, the water-level member received payments from the fire-level members?

120.     Isn't it true that the payments that the water-level member received from each of the fire-level members were typically between $1,400 and $1,425 each?

121.     Isn't it true that after three board splits, a fire-level member would be "in the water" and ready to receive the "blessing" from the new "fires"?

122.     Isn't it true that after all the payments were made by fire-level members to the individual in the water, the playing board would split into two boards?

123.     Isn't it true that after the playing board split into two boards, everyone moved up a level on the new playing board?

124.     Isn't it true that after the playing board split into two boards and everyone moved up a level on the new playing board, the individual who had been "in the water" on the original playing board was removed from the playing board?

13

PLAINTIFFS' EXHIBIT 41
FTC-BINT-002253

125.    Isn't it true that by the structure of the BINT program, the process of recruiting

and splitting playing boards within BINT would continue indefinitely?

126.    Isn't it true that BINT used the term "blessed out" to refer to the payout that

members would allegedly receive?

127.    Isn't it true that being "blessed out" is the payout that members received when

they were in the water on the playing board?

128.    Isn't it true that "tripling up" refers to purchasing three spots on three levels of the

same board?

129.    Isn't it true that "double up" refers to purchasing two spots on the same level of

the same playing board?

130.    Isn't it true that "double down" refers to purchasing two spots on the same

playing board, with one spot being one level directly beneath the other?

131.    Isn't it true the payout that members received in the water position on the BINT

playing board was simply payments other members made to join the board?

132.    Isn't it true that, in virtually every instance, all payments to individuals in the

water on the playing board were only payments made by other members to join a board?

133.    Isn't it true that BINT began to experience difficulty splitting boards?

134.    Isn't it true that BINT began to experience difficulty getting members blessed

out?

135.    Isn't it true that BINT began to struggle to recruit new members to the scheme?

136.    Isn't it true that the difficulty BINT eventually encountered getting members

blessed out was a direct consequence of BINT struggling to recruit new members?

PLAINTIFFS' EXHIBIT 41

FTC-BINT-002254

137.     Isn't it true BINT's structure ensured that most participants would not receive more than they invested in BINT?

138.     Isn't it true BINT's structure ensured that many participants would not receive more than they invested in BINT?

139.     Isn't it true that many participants have not received more than they invested in BINT?

140.     Isn't it true that most participants have not received more than they invested in BINT?

141.     Isn't it true that at all times during the existence of BINT, many members had not made more money from BINT than they had paid in?

142.     Isn't it true that at all times during the existence of BINT, most members had not made more money from BINT than they had paid in?

143.     Isn't it true that most BINT members have never been "blessed out"?

144.     Isn't it true that many BINT members have never been "blessed out"?

145.     Isn't it true that most BINT members never made it to a water position on a Playing Board?

146.     Isn't it true that many BINT members never made it to a water position on a Playing Board?

147.     Isn't it true most BINT members never received payments from other members exceeding in total the amount of money they paid to other members?

148.     Isn't it true most members did not recoup the money they invested in the BINT program?

15

PLAINTIFFS' EXHIBIT 41
FTC-BINT-002255

149.     Isn't it true many members did not recoup the money they invested in the BINT

program?

150.     Isn't it true that BINT's structure would require that it grow perpetually to keep

from collapsing?

151.     Isn't it true that, for every member who was blessed out, eight additional

members had to pay into the BINT playing board?

152.     Isn't it true that BINT implemented a process with its playing boards called

Fusion?

153.     Isn't it true that you created Fusion in an effort to address BINT's struggles to

recruit new members?

154.     Isn't it true that, on Fusion boards, for every member who was blessed out, four

members had to pay in to the BINT playing board?

155.     Isn't it true that Fusion was implemented in or around September 2020?

156.     Isn't it true Fusion involved halving the size of some playing boards to lessen the

number of recruits required to be entitled to a payout?

157.     Isn't it true that BINT attempted to address stagnation by combining boards with

vacant positions?

158.     Isn't it true that BINT used Kill Codes to eliminate boards that had been

combined to address stagnation in closing boards?

159.     Isn't it true the BINT community had subgroups?

160.     Isn't it true BINT initially prohibited members from participating in subgroups?

161.     Isn't it true that many members would not have joined BINT had they been

16

alerted to the truth about the program by an honest online review from a participant in the program?

162.     Isn't it true that most members would not have joined BINT had they been alerted to the truth about the program by an honest online review from a participant?

163.     Isn't it true that no members would have joined BINT had they been alerted to the truth about the program by an honest online review from a participant in the program?

164.     Isn't it true that subgroups were essentially a separate pyramid within the BINT community?

165.     Isn't it true you had authority to control subgroups within BINT?

166.     Isn't it true you dictated policies for subgroups to subgroup leaders?

167.     Isn't it true subgroups within BINT operated under your guidance?

168.     Isn't it true you represented that members would get "free fires" for their first payout?

169.     Isn't it true you represented to consumers that so many people wanted to join BINT that members would not need to recruit anyone to receive their first payout?

170.     Isn't it true that you represented that all members would be required to do to get their first payout from BINT was pay the fee to join a playing board?

171.     Isn't it true BINT changed its policy of providing free fires to members who had not received a payout such that members were no longer entitled to free fires?

172.     Isn't it true BINT members had the option or purchasing fires instead of recruiting them?

173.     Isn't it true that members could be their own fire by "doubling down" on a

17

PLAINTIFFS' EXHIBIT 41
FTC-BINT-002257

playing board?

174.     Isn't it true you have recruited new members to join BINT?

175.     Isn't it true you directed BINT members to recruit new participants to join BINT?

176.     Isn't it true that you emphasized the importance of recruiting new participants to BINT in Zoom videos for BINT members?

177.     Isn't it true you directed members to recruit their friends and family to join BINT?

178.     Isn't it true that, on a Zoom call for BINT members, LaShonda Moore stated that "we want to help you guys bring people into the community"?

179.     Isn't it true you promoted incentives for members to recruit individuals to join BINT?

180.     Isn't it true that the BINT promotional video, which stated "members that sign up the most Sparks will have a chance to win cash giveaways, big screen TVs, and gift cards," was provided to the BINT community?

181.     Isn't it true that you approved the BINT promotional video that stated "members that sign up the most Sparks will have a chance to win cash giveaways, big screen TVs, iPads, and gift cards"?

182.     Isn't it true that you reviewed the BINT promotional video that stated "members that sign up the most Sparks will have a chance to win cash giveaways, big screen TVs, iPads, and gift cards" before it was disseminated within the BINT community?

183.     Isn't it true you approved the sending of a mass text message to the BINT community stating: "members with the most new signups can win Cash Giveaways, Flat Screen Tv's and so much more!! Please invite ALL your friends and family to join"?

18

PLAINTIFFS' EXHIBIT 41
FTC-BINT-002258

184.     Isn't it true that most members joined after having been invited by someone they knew?

185.     Isn't it true that to join BINT, an individual had to submit an application on bintapp.com?

186.     Isn't it true an individual's BINT application had to list the individual who recruited you to join the program?

187.     Isn't it true individuals who were interested in joining BINT were directed to text a code to the number 474747 using their phone?

188.     Isn't it true that BINT referred to new recruits as "sparks"?

189.     Isn't it true that you conducted many of the recruitment Zoom calls for potential recruits together with your spouse, Defendant LaShonda Moore?

190.     Isn't it true that, although members were initially told that they would get free fires for their first payout, BINT has always required that members recruit to obtain subsequent payouts?

191.     Isn't it true you did not create BINT to sell products?

192.     Isn't it true the purpose of BINT has never been to sell products?

193.     Isn't it true that BINT made negligible revenue selling products?

194.     Isn't it true BINT made negligible revenue selling products related to BINT?

195.     Isn't it true BINT operated for months before considering whether to sell products?

196.     Isn't it true BINT operated for months before considering whether to offer products?

PLAINTIFFS' EXHIBIT 41

FTC-BINT-002259

197.	Isn't it true that BINT began to offer products primarily because you thought this would insulate BINT from accusations that it was a pyramid scheme?

198.	Isn't it true that BINT began to offer products primarily because you thought this would insulate BINT from accusations that it was illegal?

199.	Isn't it true you did not market Conecmi as a reason to sign up for BINT?

200.	Isn't it true you did not market any physical product as a reason to sign up for BINT?

201.	Isn't it true you did not market any e-books as a reason to sign up for BINT?

202.	Isn't it true you did not market any courses as a reason to sign up for BINT?

203.	Isn't it true that you did not have to sign up for BINT to download BINT's e-books from its website?

204.	Isn't it true individuals could attend the courses associated with BINT without being a BINT member?

205.	Isn't it true that most BINT members did not download BINT's e-books?

206.	Isn't it true that most BINT members did not view any materials relating to BINT's credit-improvement course?

207.	Isn't it true that you marketed being "blessed out" as the primary reason to sign up for BINT?

208.	Isn't it true that Conecmi served no purpose in the BINT program other than to allow members to track their position on BINT playing boards?

209.	Isn't it true that BINT members couldn't do anything on Conecmi other than check information about BINT playing boards?

PLAINTIFFS' EXHIBIT 41
FTC-BINT-002260

210.     Isn't it true that most members never sold any products related to BINT?

211.     Isn't it true that most members never sold any products as part of their participation in BINT?

212.     Isn't it true that members were not required to sell any products in order to receive a payment from any other BINT member?

213.     Isn't it true that members were not required to sell any products in order to receive the $11,200, $11,400, $5,600 or $5,700 from participating in BINT?

214.     Isn't it true that members did not have to sell products to participate on a BINT playing board?

215.     Isn't it true that members did not have to sell any products to receive a payout in BINT?

216.     Isn't it true that the payouts from BINT's playing boards were unrelated to the sale of any product?

217.     Isn't it true that BINT's playing boards operated entirely separately from any product offerings that BINT may have had?

218.     Isn't it true that BINT represented to members that it would "restart"?

219.     Isn't it true BINT announced an upcoming "restart" in around November 2020?

220.     Isn't it true that, as part of the "restart," BINT planned to visually restyle its playing boards?

221.     Isn't it true, as part of the "restart," BINT planned to update its terminology relating to the playing boards?

222.     Isn't it true that, as part of the "restart," BINT changed the board position name

PLAINTIFFS' EXHIBIT 41
FTC-BINT-002261

"Fire" in BINT to "Blessing"?

223.      Isn't it true that, as part of the "restart," the board position name "Wind" in BINT was changed to "Invitation"?

224.      Isn't it true that, as part of the "restart," the board position name "Earth" in BINT was changed to "Nester"?

225.      Isn't it true that, as part of the "restart," the board position name "Water" in BINT was changed to "Testimony"?

226.      Isn't it true that, as part of the "restart," BINT changed the structure of payments on BINT playing boards?

227.      Isn't it true this restructuring as part of the "restart" was promoted as addressing the fact that members were hesitant to invest more in BINT?

228.      Isn't it true the restructured playing boards created as part of the anticipated "restart" directed members paying blessings to split their payment between the individual in the center of the board and the individual on the second level of the playing board?

229.      Isn't it true that some of the changes anticipated with the BINT "restart" were promoted as allowing members to "break even" with regard to the money they invested in BINT?

230.      Isn't it true you continued to promote BINT even after becoming aware that members had complained to law enforcement agencies concerning BINT?

231.      Isn't it true you continued to promote BINT even after becoming aware that members had complained to the FTC concerning BINT?

232.      Isn't it true you continued to promote BINT even after becoming aware that

PLAINTIFFS' EXHIBIT 41
FTC-BINT-002262

members had complained to the Securities and Exchange Commission concerning BINT?

233.     Isn't it true you continued to promote BINT even after becoming aware that members had complained to state attorneys general concerning BINT?

234.     Isn't it true you continued to promote BINT even after becoming aware that members had complained to the Better Business Bureau concerning BINT?

235.     Isn't it true Marlon Moore told BINT members that some members and former members had complained to government agencies?

236.     Isn't it true that you were aware that members had complained that BINT was a pyramid scheme?

237.     Isn't it true you attempted to hide the nature of BINT's activity from law enforcement?

238.     Isn't it true you attempted to hide the nature of BINT's activity from payment processors?

239.     Isn't it true BINT forbade members from using certain payment apps?

240.     Isn't it true that a "QC" in the context of BINT is a BINT employee in charge of "quality control"?

241.     Isn't it true QCs were tasked with monitoring members' statements on the Band app in order to discipline members who criticized BINT?

242.     Isn't it true you have removed members from the BINT private group on the Band app for criticizing BINT?

243.     Isn't it true that BINT has removed members who disparaged BINT from BINT's private Band app messaging board?

PLAINTIFFS' EXHIBIT 41
FTC-BINT-002263

244.     Isn't it true you have directed others to remove members from the BINT private group on the Band app for disparaging or criticizing BINT?

245.     Isn't it true you have directed admins to remove members who criticized BINT from the Band app group?

246.     Isn't it true you have directed admins to remove members who criticized BINT from Conecmi?

247.     Isn't it true some members have been removed from the BINT community on the Band app because they requested a refund?

248.     Isn't it true previously marked **Exh. 5, Bates No. Moore 106** was distributed to BINT members?

249.     Isn't it true you approved the distribution of previously marked **Exh. 5, Bates No. Moore 106** to BINT members?

250.     Isn't it true previously marked **Exh. 5, Bates No. Moore 106** accurately reflects BINT's policy?

251.     Isn't it true that the policy in previously marked **Exh. 5, Bates No. Moore 106** stating that "[i]f you post on social media or the Internet, you will be removed from the board, removed from the group chat, and you will forfeit your blessing" was actually enforced by BINT?

252.     Isn't it true that Marlon Moore stated in a BINT Zoom that if members post about BINT on social media, they would be removed from the group?

253.     Isn't it true you encouraged BINT members to confront other members who hurt recruiting by speaking negatively about their experience in BINT?

24

254.     Isn't it true that BINT's social media policy caused millions in losses for BINT members who signed up without knowing the truth about the program?

255.     Isn't it true thousands of members paid $1,400 for a spot on BINT's playing boards?

256.     Isn't it true thousands of members paid $1,425 for a spot on BINT's playing boards?

257.     Isn't it true that more than 9,000 individuals have paid to participate in BINT?

258.     Isn't it true that more than 8,700 individuals have paid to participate in BINT?

259.     Isn't it true that more than 8,000 individuals have paid to participate in BINT?

260.     Isn't it true that more than 7,000 individuals have paid to participate in BINT?

261.     Isn't it true many members paid for multiple board spots?

262.     Isn't it true many members paid in to BINT more than $10,000?

263.     Isn't it true many members paid in to BINT well in excess of $10,000?

264.     Isn't it true at least one Member invested as much as $62,700 in BINT?

265.     Isn't it true members cumulatively invested tens of millions of dollars in the BINT program?

266.     Isn't it true members cumulatively invested over $30 million dollars in the BINT program?

267.     Isn't it true members cumulatively invested over $40 million dollars in the BINT program?

268.     Isn't it true members cumulatively invested over $42 million dollars in the BINT program?

PLAINTIFFS' EXHIBIT 41
FTC-BINT-002265

269.     Isn't it true that you represented that members had paid in over $30 million into BINT?

270.     Isn't it true that you represented that members had paid in over $40 million into BINT?

271.     Isn't it true LaShonda Moore had her name placed her name in vacant spots on Playing Boards without paying another Member a "blessing"?

272.     Isn't it true LaShonda Moore had the name of friends or family placed in vacant spots on Playing Boards without paying another Member a "blessing"?

273.     Isn't it true LaShonda Moore has received payments through BINT using aliases?

274.     Isn't it true "Ashley Morgan" was an alias used by LaShonda Moore?

275.     Isn't it true you received a share of each payment a BINT member made to Conecmi LLC?

276.     Isn't it true that BINT Operations LLC received "commission" payments from Conecmi related to BINT members' payments for the use of Conecmi required to participate in BINT?

277.     Isn't it true BINT Operations LLC received more than $1 million in payments from BINT?

278.     Isn't it true you received more than $1 million in payments from BINT?

279.     Isn't it true you personally spent money in BINT Operations LLC's account that had been previously set aside for the payment of refunds to BINT members?

280.     Isn't it true that you and your spouse, Defendant LaShonda Moore, profited more than a million dollars from your operation of BINT?

PLAINTIFFS' EXHIBIT 41
FTC-BINT-002266

281.     Isn't it true that you and your spouse, Defendant LaShonda Moore, received substantial profits from your participation in BINT?

282.     Isn't it true that you dissipated assets traceable to BINT in an effort to protect those assets from potential collections as a result of this or other lawsuits?

283.     Isn't it true that you contacted former BINT admins about this case?

284.     Isn't it true you contacted former BINT admins about this case in an effort to influence their testimony?

285.     Isn't it true that you contacted former BINT admins about this case in an effort to discourage them from making certain statements to the FTC?

286.     Isn't it true that you suggested to former BINT admins who you believed would be contacted by the FTC that they inform the FTC that you and your spouse had done nothing wrong?

287.     Isn't it true that you suggested to former BINT admins who you believed would be contacted by the FTC that they inform the FTC that you and your spouse were good people?

288.     Isn't it true that you contacted Alexia Berryman concerning her potential testimony to the FTC?

289.     Isn't it true you attempted to influence Alexia Berryman's testimony in this case?

290.     Isn't it true you attempted to intimidate potential witnesses in this case in an effort to alter their testimony?

291.     Isn't it true you deleted information from BINT's Conecmi account after learning that members had complained to state or federal agencies concerning BINT?

PLAINTIFFS' EXHIBIT 41
FTC-BINT-002267

292.     Isn't it true you directed others to delete information from BINT's Conecmi account after learning that members had complained to law enforcement agencies concerning BINT?

293.     Isn't it true you deleted information from bintapp.com after learning that members had complained to state or federal agencies concerning BINT?

294.     Isn't it true you directed others to delete information from bintapp.com after learning that members had complained to law enforcement agencies concerning BINT?

295.     Isn't it true you destroyed relevant information concerning this case in anticipation of civil litigation?

296.     Isn't it true that previously marked **Exh. 4, Moore 13-23** is a true and accurate copy of a document disseminated to BINT members?

297.     Isn't it true that you approved the distribution of **Exh. 4, Moore 13-23** to BINT members?

298.     Isn't it true that you approved the content of **Exh. 4, Moore 13-23**?

299.     Isn't it true that **Exh. 4, Moore 13-23** accurately reflects BINT's policies and procedures?

300.     Isn't it true you approved the content of previously marked **Exh. 8, Moore 517-527**?

301.     Isn't it true **Exh. 8, Moore 517-527** was distributed to BINT members?

302.     Isn't it true **Exh. 8, Moore 517-527** accurately reflects BINT's policies and procedures?

303.     Isn't it true **Exh. 8, Moore 517-527** accurately describes how BINT's playing

28

boards work?

304.    Isn't it true the "BINTionary" found in **Exh. 8, Moore 517-527** accurately

describes how particular terms were used within the BINT program?

305.    Isn't it true **Exh. 32, FTC-BINT-1620-1623** is a privacy agreement that BINT

members were obligated to agree to in order to participate in BINT?

306.    Isn't it true the privacy agreement shown in **Exh. 32, FTC-BINT-1620-1623** was

enforced?

307.    Isn't it true **Exh. 34, MOORE 000105-000118** accurately describes BINT's

policies and procedures?

308.    Isn't it true that none of the products described in **Exh. 35, MOORE 000304-306**

were required to be sold by BINT members to participate in BINT?

309.    Isn't it true that BINT operated for months without any of the purported products

described in **Exh. 35, MOORE 000304-306** being offered?

310.    Isn't it true that the products described in **Exh. 35, MOORE 000304-306** were

offered merely as a means of insulating BINT from accusations that it is a pyramid

scheme?

311.    Isn't it true that you have no documents supporting the figures included in **Exh.**

**35, MOORE 000304-306**?

312.    Isn't it true that you created the document labeled **Exh. 35, MOORE 000304-306**

for the purpose of providing to Plaintiffs in discovery in this case?

313.    Isn't it true that you represented that you knew Steve Harvey?

314.    Isn't it true that you represented that Steve Harvey was aware of BINT?

29

315.     Isn't it true that you have never discussed BINT with Steve Harvey?

316.     Isn't it true that you have never met Steve Harvey?

317.     Isn't it true that you used your appearance on Oprah's network as a means of convincing consumers about the purported legitimacy of BINT?

318.     Isn't it true that Marlon Moore stated in a Zoom video for BINT members that "[w]e know that if you put your hard-earned money in here, you expected a return, and you are still going to get a return. Just know that sometimes things take longer than you feel they should."?

319.     Isn't it true that BINT is not the first blessing loom you participated in?

320.     Isn't it true that before BINT you were in a blessing group called "Multiply Blessings"?

321.     Isn't it true that before BINT you were in a blessing group called "the Moore Life Group"?

322.     Isn't it true that you represented in numerous instances to consumers that you had consulted with an attorney concerning the legality of BINT?

323.     Isn't it true that you represented in numerous instances to consumers that an attorney had advised you that BINT was operating in a legally compliant manner?

324.     Isn't it true that no attorney ever advised you that BINT was a legally compliant operation?

325.     Isn't it true that you never spoke with anyone at the Arkansas Attorney General's Office concerning BINT prior to this lawsuit?

326.     Isn't it true that you offered prizes to BINT members who recruited the most new

30

PLAINTIFFS' EXHIBIT 41
FTC-BINT-002270

members?

327.     Isn't it true hundreds of members requested refunds?

328.     Isn't it true thousands of members requested refunds?

329.     Isn't it true that you represented to consumers that participating in BINT would

allow members to create an additional source of income?

330.     Isn't it true that you represented to consumers that participating in BINT would

allow them to make an overall improvement to their lives?

331.     Isn't it true that Marlon Moore made the following statement to BINT members

on a Zoom call: "one of the main reasons we started BINT was to help people achieve

some type of success in their lives."?

332.     Isn't it true Nehemiah Thompson has used the alias "Nathan Newman"?

333.     Isn't it true that more than 50% of members made less money by participating in

BINT than what they paid into the program?

334.     Isn't it true more than 50% of members have never received the $11,200,

$11,400, $5,600, or $5,700 from participating in BINT?

335.     Isn't it true the infographic on page 8 of the Complaint in this case (**Doc. 1**) is a

true and correct copy of an infographic previously provided to at least some BINT

members?

336.     Isn't it true the infographic on page 8 of the Complaint in this case (Doc. 1) is the

same infographic contained on page 5 at MOORE 000521 of the document **MOORE

000517-000525** entitled BINT 101: Community Resource Guide Last Updated

September 27, 2020?

PLAINTIFFS' EXHIBIT 41
FTC-BINT-002271

337.     Isn't it true the infographic on page 8 of the Complaint in this case (Doc. 1) is the same infographic contained on page 5 at FTC-BINT-000078 of the document **FTC-BINT-000074-000082 (Attachment B)** entitled BINT 101: Community Resource Guide Last Updated October 14, 2020?

338.     Isn't it true at least some members on the second level of a BINT Playing Board were required to fill two empty spots on the first level of that Playing Board?

339.     Isn't it true all BINT Admins operated under the direction of LaShonda Moore and Marlon Moore?

340.     Isn't it true **MOORE 005384-005385** is an email sent to LaShonda and Marlon Moore by Nehemiah Thompson (aka Nathan Newman) on August 22, 2020?

341.     Isn't it true you discussed with individuals who were not BINT participants the possibility of using Conecmi for their business?

342.     Isn't it true you represented to consumers that You sold to Conecmi LLC your rights to Binttech?

343.     Isn't it true you receive a portion of all money earned by Conecmi LLC's use of the Binttech software?

344.     Isn't it true you received hundreds of thousands of dollars through your participation in the BINT program?

345.     Isn't it true you received over $1 million total in Blessings from participating in BINT?

346.     Isn't it true you received over $2 million total in Blessings from participating in BINT?

32

PLAINTIFFS' EXHIBIT 41
FTC-BINT-002272

347.     Isn't it true you placed the names of individual BINT Admins in vacant spots on

BINT playing boards?

348.     Isn't it true that you placed the name "Admin Team" in vacant spots on BINT

playing boards?

349.     Isn't it true your children received money from having their names placed on

BINT playing boards?

350.     Isn't it true your parents received money from having their names placed on

BINT playing boards?

351.     Isn't it true that **MOORE 415-461** is a spreadsheet containing responses to a

survey you provided to BINT members sometime during or after October 2020?

352.     Isn't it true that **MOORE 415-461** contained approximately 7,450 responses?

353.     Isn't it true that **MOORE 415-461** contained responses from approximately 1,725

members with Arkansas phone numbers?

354.     Isn't it true that **MOORE 415-461** contained responses from approximately 1,381

Arkansas members who reported paying money put never being Blessed or paid out by

BINT?

355.     Isn't it true that you have asserted a Fifth Amendment privilege against self-

incrimination in response to Interrogatory 1 in Plaintiff FTC's First Set of Requests for

Production of Documents and Interrogatories to Defendant Marlon Moore, which

requested that you "[i]dentify each product or service that has been sold through the

BINT program or by BINT Operations, when BINT or BINT Operations first began

offering the product and when (if ever) it ceased offering the product or service, the

33

number of sales made of each product or service, the gross revenue for each product and service, how the product was marketed, and any documents associated with its marketing or advertisement."?

356.     Isn't it true you that you have not provided the data requested in Interrogatory 1 of Plaintiff FTC's First Set of Requests for Production of Documents and Interrogatories to Defendant Marlon Moore?

357.     Isn't it true that you have asserted a Fifth Amendment privilege against self-incrimination in response to Interrogatory 2 of Plaintiff FTC's First Set of Requests for Production of Documents and Interrogatories to Defendant Marlon Moore, which requested that you "[s]tate, separately for each individual or entity, the amount of money received by You or by any family member or relative of any Defendant: a. through their participation in any BINT Playing Board; b. from BINT Operations LLC; c. from Conecmi LLC; d. as compensation for operating Blessings in No Time; and e. from any Member, as well as when that payment was received, the reason that any such payment was made, and the products or services provided in return for any such payment."?

358.     Isn't it true you that you have not provided the data requested in Interrogatory 2 of Plaintiff FTC's First Set of Requests for Production of Documents and Interrogatories to Defendant Marlon Moore?

359.     Isn't it true that you have asserted a Fifth Amendment privilege against self-incrimination in response to Interrogatory 3 of Plaintiff FTC's First Set of Requests for Production of Documents and Interrogatories to Defendant Marlon Moore, which requested that you "[i]dentify: a. when You or any Defendant first became aware that

34

consumers had complained to a governmental agency or the Better Business Bureau concerning BINT; b. any documents or data pertaining to BINT (whether in Your personal possession or that of a third party) that were deleted or destroyed by You or any Defendant at the direction of any Defendant after You or any Defendant became aware that consumers had complained to a governmental agency or the Better Business Bureau concerning BINT; and c. the reason any such documents or data pertaining to BINT were deleted or destroyed."?

360.     Isn't it true you that you have not provided the data requested in Interrogatory 3 of Plaintiff FTC's First Set of Requests for Production of Documents and Interrogatories to Defendant Marlon Moore?

361.     Isn't it true that you have asserted a Fifth Amendment privilege against self-incrimination in response to Interrogatory 4 of Plaintiff FTC's First Set of Requests for Production of Documents and Interrogatories to Defendant Marlon Moore, which requested that you provide "[f]or each Member, identify the date and amount for: a. each payment relating to BINT or Conecmi; and b. each payment made or received relating to that Member's participation in BINT."?

362.     Isn't it true you that you have not provided the data requested in Interrogatory 4 of Plaintiff FTC's First Set of Requests for Production of Documents and Interrogatories to Defendant Marlon Moore?

363.     Isn't it true that Plaintiff State of Arkansas provided you with unresolved complaints from Arkansas members marked as AR000001-000176?

PLAINTIFFS' EXHIBIT 41
FTC-BINT-002275